**IN THE DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

MYRA MATUTE and ANDREW ) 
FISCHER, husband and wife, ) 
acting on their own behalf and V. F., ) 
a minor, by and through his parents ) 
and natural guardians, MYRA MATUTE ) 
and ANDREW FISCHER )
                 )
         Plaintiffs, )      Civil Action No. 5:24-cv-00988
                 )
        v. )
                 )
THOMAS E. STRAUSS, INC., t/d/b/a )
AMISHVIEW INN AND SUITES, )
                 )
        Defendant. )

## COMPLAINT IN CIVIL ACTION AND DEMAND FOR JURY TRIAL
### I
### INTRODUCTION

Myra Matute and her husband have a 13 year old autistic son. In 2023, Myra's son's birthday wish was to visit Amish Country. Myra and her husband carefully looked for and found what appeared to be a family friendly and safe hotel to stay in - the Amishview Inn and Suites, in Bird-in-Hand, Lancaster County, Pennsylvania. The Hotel complex is owned and operated by Defendant Thomas E. Strauss, Inc.

On February 23, 2023, at about 2:00 a.m., Myra Matute, her husband and son were sleeping in their hotel room, when a fire broke out. The fire originated in a vending machine alcove located near the middle of the first floor guestroom corridor in the main building of the Hotel. To the west of the vending machine alcove were six guestrooms, including where Myra and her family were sleeping. In the corridor are two fire exits, marked by illuminated exit signs. Both of the exits are to the east of the vending machine alcove. When the people staying in the six guestrooms west of the

alcove, including Myra and her family, attempted to evacuate, they found their path to the two exits, and to safety, blocked by fire, smoke, and intense heat coming out of the open vending machine alcove. Adding to the guests' confusion and panic was the fact that the hotel's emergency lighting system failed leaving the guestroom corridor pitch black. To make things worse, the hotel did not have a sprinkler system. The Defendant chose to save money by not installing a sprinkler system since it was not required by code.

Guests in three of the six rooms trapped by the fire, believing their only way out was through the second story windows, tied bed sheets together, fastened them to a window pillar and lowered the tied-up sheets out of the windows, hoping to climb down to safety. Myra Matute, was the first guest to attempt to climb down one of the bed sheet ropes. As she climbed out the window, with her husband and son watching, she fell, landed on the concrete walkway, crushing several vertebrae. She may never walk on her own, again.

The Hotel chose to place the vending machines in the open alcove near the middle of the guestroom corridor so that the vending machines would be closer to the guestrooms in order to increase sales. The Hotel chose not to install a sprinkler system to save money. Instead of providing a safe path of escape for the guests in the six guestrooms west of the vending machine alcove, the Hotel chose sales over safety and profits over people.

Plaintiffs, Myra Matute and Andrew Fischer, husband and wife, individually, and as guardians of V. F., a minor, bring this action for negligence per se, negligence and reckless disregard, negligent infliction of emotional distress and loss of consortium against Defendant for causing and permitting a dangerous fire hazard to exist in violation of multiple fire and safety codes, regulations, and statutes, which caused and resulted in the permanent injuries to Plaintiffs.

-2-

**II**

## PARTIES AND JURISDICTION

All facts and circumstances that give rise to the subject lawsuit occurred in Bird-in-Hand, Leacock Township, Lancaster County, Pennsylvania.

1. Plaintiffs, Myra Matute and Andrew Fischer, wife and husband, are, and at all times relevant hereto, were residents of New Rochelle, New York.

2. Plaintiff, V. F., a minor, and the son of Myra Matute and Andrew Fischer is, and at all times relevant hereto, was a resident of New Rochelle, New York.

3. The Amishview Inn and Suites hotel is situated north of Old Philadelphia Pike and is part of a complex which is owned and operated by Defendant Thomas E. Strauss, Inc., t/d/b/a Amishview Inn and Suites, which at all relevant times, was authorized to do, and was doing, business in Lancaster County, Pennsylvania.

4. Plaintiffs alleges that Defendant is negligently, willfully, contractually, and/or otherwise legally responsible for the events and happenings herein referred to and proximately caused injury and damages to Plaintiffs as herein alleged.

5. That exercise of the jurisdiction by this Court over Defendant in this action is appropriate because Defendant is a resident of the Commonwealth of Pennsylvania, and has done, and continues to do, business in the Commonwealth of Pennsylvania, and committed a tort in the Commonwealth of Pennsylvania.

6. That all incidents described herein occurred in the Lancaster County, Pennsylvania, which is within the judicial district covered by the Federal Court for the Eastern District of Pennsylvania.

-3-

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 because there is complete diversity of the citizenship of the parties and the amount in controversy is greater than $75,000, exclusive of interest, attorney fees, and costs.

8.      Venue is proper in this judicial district, and division, pursuant to 28 U.S.C. §§ 1391 (a), (b) (2), and (c), because the events giving rise to this claim occurred in this judicial district and Defendant transacts business in this judicial district.

9.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendant is subject to personal jurisdiction in this judicial district.

### III.

### FACTUAL ALLEGATIONS

10.     The Amishview Inn and Suites is located at 3125 Old Philadelphia Pike, Bird-in-Hand, Leacock Township, Lancaster County, Pennsylvania.[1]

11.     The Amishview Inn and Suites, (hereinafter "Defendant" or "Hotel"), is a large multistory hotel with approximately 85 guestrooms and/or suites. The main building is a three-story structure which was built in or about 2003. There is a five-story annex which was built in or about 2013. The two buildings are connected by a 20 foot enclosed bridge on the first floor. The annex is used for guests who are adults only. Families with children are permitted to stay in the main building.

12.     The main building of the Hotel faces south with the guestroom corridors in the building running in an east-west direction.

13.     Guestrooms in the main building are on the north and south sides of the guestroom

---

[1] The Amishview Inn and Suites hotel is situated north of Old Philadelphia Pike and is part of a complex which is owned and operated by Defendant Thomas E. Strauss, Inc., tdba Amishview Inn and Suites.

corridors.

14.     The Hotel lobby is located in the southeast corner of the building. See Exhibit 1, Hotel Floor Plan.

15.     The first floor guestroom corridor in the main building is partially at ground level and partially above a ground floor, which means that there are rooms on the "first floor" which are actually the second story of the building.

16.     On the north side of the main building first floor guestroom corridor, there are eleven guestrooms. See Exhibit 1.

17.     On the south side of the main building first floor guestroom corridor, going from east to west, there are a hotel staff room, two guestrooms, an exit door to an enclosed stairway, a vending machine alcove and one more guestroom. See Exhibit 1. In the vending machine alcove, there was an ice machine and two vending machines, (one for snacks and a refrigerated one for drinks). All of the vending machines were on the east wall of the alcove.

18.     The vending machine alcove is located to the west of, and adjacent to, the exit door to the enclosed stairway. See Exhibit 1.

19.     To the west of the vending machine alcove are six guestrooms, five are across the corridor on the north side, (100, 101, 102, 103, and 104), and one is on the same side as the vending machine alcove (117). See Exhibit 1.

20.     There are two exit signs in the "first floor" guestroom corridor. See Exhibit 2 and Exhibit 3, Photos of the two exit signs.

21.     One emergency exit sign is located approximately midway in the corridor suspended from the ceiling with an arrow pointing at an exit door on the southern side of the corridor. See

-5-

Exhibit 2. Behind the exit door is an enclosed stairway that leads down one floor to an exterior exit. See Exhibit 4 and 5.

22.    The only other emergency exit sign is located at the eastern end of the corridor, which is where the lobby area of the hotel is located. See Exhibit 3. The emergency exit sign is located above the double door-sized doorway. Id.

23.    There is no emergency exit sign at the western end of the corridor. See Exhibit 6, photo of western end of hallway.

24.    It is believed, and therefore averred, that it is known, or should be known, that vending machines can be a source of fires.

25.    It is believed, and therefore averred, that it is known, or should be known, that vending machines can introduce significant combustible materials to egress routes.

26.    Should a fire occur in the vending machine alcove of the Hotel, then the fire, (and the related heat and smoke), could cause a foreseeable risk of harm by creating a dangerous, life-threatening barrier, barring guests located in the six rooms to the west of the vending machine alcove from the pathway to safety as designated by Defendant by the use of the two illuminated emergency exit signs both of which are located to the east of the vending machine alcove.

27.    When the main building of the Hotel was built, Defendant had a choice as to whether a sprinkler system should be installed, since the Building Code at the time permitted the option of not installing a sprinkler system.

28.    It is beleived and therefore averred that Defendant chose to not install a sprinkler system, since it cost less money to build the Hotel without a sprinkler system.

-6-

**III.A.  THE EARLY MORNING OF FEBRUARY 23, 2023, THE TIME OF THE FIRE**

29.     On the night of Thursday, February 22, 2023, there were guests staying in all six guestrooms located to the west of the vending machine alcove on the first floor guestroom corridor of the main Hotel building.

30.     Around 2:00 a.m. on February 23, 2023, a fire broke out in the vending machine alcove located on the south side, and near the middle, of the first floor guestroom corridor of the main hotel building. See Exhibit 1 (Floor Plan), and Exhibit 7, (Pennsylvania State Police, Fire Marshal Unit Report, Printed On Jun-12-2023, p. 24 of 73).

31.     The fire, smoke, and heat caused the fire alarms to sound and the fire doors in the first floor guestroom corridor to close.

32.     The fire originated in a vending machine located in the vending machine alcove. See Exhibit 7, (PA.S.P., F.M.U. Report, p. 39 of 73).

33.     Of the six guestrooms west of the vending machine alcove, Room 100 was the farthest to the west of the vending machine alcove and was across the guestroom corridor on the north side. See Exhibit 1, (Floor Plan).

34.     The guests in Room 100, Mary McCleod and Christine Stanbridge, were alerted to the fire by the fire alarm. They tried to escape via the guestroom corridor but due to the thick black smoke were forced back into their room. See Exhibit 7, (PA.S.P., F.M.U. Report, p. 38 of 73).

35.     They were trapped by the fire, since in order to reach either of the two exits indicated by the illuminated exit signs in the corridor, they would have to go into the fire to attempt to reach either of the exits which were on the other side of the fire, or to the east of the fire.

36.     In an attempt to escape the fire and save their lives, they had to come up with another

path to safety. The only other path to get out of the Hotel that they were aware of was to go out the guestroom windows.

37.     Because Room 100 was located on the second story, they needed a rope to climb down to safety.

38.     They removed the sheets from the beds and tied them together in order to make a bed sheet escape rope.

39.     They tied the bed sheet escape rope to the center pillar between the two window frames, so they could climb down to safety. See Exhibit 8, Photo of bed sheets hanging out three guestroom windows (100, 101, and 102).

40.     Before they attempted to escape using the bed sheet escape rope, they heard sirens for emergency vehicles approaching. They decided to wait to be rescued.

41.     They were later rescued by firefighters via a ladder and had to climb out the window down the ladder to safety. See Exhibit 7, (PA.S.P., F.M.U. Report, p. 38 of 73).

42.     Room 101, was the second farthest guestroom to the west of the vending machine alcove, across the guestroom corridor on the north side. See Exhibit 1, (Floor Plan).

43.     The guests in Room 101, Ellen Lance and Cindy Vognetz, were alerted to the fire by the fire alarm and by people knocking on the door. See Exhibit 7, (PA.S.P., F.M.U. Report, p. 37 of 73).

44.     They opened the door and saw heavy dark smoke in the hallway. They tried to escape via the hallway but due to the smoke were forced back into their room. Id.

45.     They were trapped by the fire since the two exits marked by the exit signs were both on the other side of the fire, or to the east of the fire.

-8-

46.     In an attempt to escape the fire and save their lives, they had to come up with another path to safety. The only other path to get out of the Hotel that they were aware of was to go out the guestroom windows.

47.     Because Room 101 was located on the second story, they needed a rope to climb down to safety.

48.     They removed the sheets from the beds and tied them together in order to make a bed sheet escape rope.

49.     They tied the bed sheet escape rope to the center pillar between the two window frames and lowered it out the window so they could climb down to safety. See Exhibit 8, Photo of bed sheets hanging out three guestroom windows.

50.     Before they attempted to escape using the bed sheet escape rope, they heard sirens for emergency vehicles approaching and decided to wait to be rescued. See Exhibit 7, (PA.S.P., F.M.U. Report, p. 37 of 73).

51.     They were later rescued by firefighters via a ladder and had to climb out the window and down the ladder to safety. See Exhibit 7, (PA.S.P., F.M.U. Report, p. 37 of 73).

52.     Room 102, was the third farthest guestroom to the west of the vending machine alcove, across the guestroom corridor on the north side. See Exhibit 1, (Floor Plan).

53.     The guests in Room 102, were Alfredo Caceres, Joanne Caceres and their eleven-year-old son M. C., a minor. They were alerted to the fire by the fire alarm. See Exhibit 7, (PA.S.P., F.M.U. Report, p. 37 of 73).

54.     Upon opening the door to the hallway, they observed heavy smoke. They tried to escape via the hallway but due to the smoke were forced back into their room. See Exhibit 7, id.

55.     They were trapped by the fire since the two exits marked by the exit signs were both on the other side of the fire, or to the east of the fire.

56.     While holding the door open, Alfredo Caceres saw another family outside their door and in the corridor. He yelled to them to come into their room to get away from the fire. See Exhibit 7, id.

57.     It turns out that the other family in the corridor were the guests staying in Room 117. Their guestroom, Room 117, was across the corridor from Room 102 and was immediately next to the fire, intense heat, and smoke emanating from the vending machine alcove. See Exhibit 1, (Floor Plan).

58.     The guests from Room 117, were Myra Matute, her husband, Andrew Fischer and their autistic thirteen-year-old son, Fischer. They were also awakened by the fire alarm. See Exhibit 7, (PA.S.P., F.M.U. Report, p. 38 of 73).

59.     Myra Matute, was the first to get up. She opened the door and looked out into the guestroom corridor. The corridor was dark, with no lights on, so she had to use her cell phone flashlight to see.

60.     While staying at the Hotel, the only direction that Myra and her family had traveled in and out of the hotel was via the lobby at the eastern end of the corridor. As such, Myra attempted to look to the right, through the darkness, to see if they could reach the lobby exit.

61.     While looking into the corridor to the right, (to the east), Myra could see flames and smoke shooting out of the vending machine alcove. Myra realized that not only were they blocked from reaching the exits on the eastern side of the fire, but also their room was immediately adjacent to the fire.

-10-

62.     The flames, heat, and smoke coming from the vending machine alcove were blocking their escape route via the exit to the stairway or the exit at the end of the common corridor leading to the lobby.

63.     They were trapped by the fire since the two exits marked by the exit signs were both on the other side of the fire, or to the east of the fire.

64.     Based upon her observations, Myra closed the door and told her husband and son to get dressed immediately since there was a fire and they had to escape.

65.     They quickly threw on some clothes and after they were dressed, she opened the door, turned her cell phone flashlight on, and they entered the guestroom corridor which was dark and filled with smoke in the hope of making an escape. This is when they heard the guests in Room 102 calling to them.

66.     Upon entering Room 102, the two families discussed what they should do to save their lives since they were trapped by the fire and were unable to reach the exits marked by the exit signs which were both on the other side of the fire.

67.     In an attempt to escape the fire and save their lives, they had to find another path to safety. The only other path to safety they were aware of was to escape through the guestroom windows.

68.     They looked out the windows and realized that there was a concrete walkway some twenty feet below them.

69.     Because Room 102 was also located on the second story, they needed some way to climb down to safety.

70.     In order to try and soften the landing, they decided to push a mattress out the window

so they could land on the mattress rather than on the concrete walkway.

71.     The two families pushed out the windows, took the sheets off one of the beds, lifted the mattress, and tried to fit it through the windows. Unfortunately, the mattress was too big to fit.

72.     Just like the guests in Rooms 100 and 101, they also removed the sheets from the beds and tied them together in order to make a bed sheet escape rope. See Exhibit 8, Photo of bed sheets hanging out three guestroom windows.

73.     They tied the bed sheet escape rope to the center pillar between the two window frames, and lowered the sheets to the ground in order to climb down to safety. Id.

74.     The two families discussed who should go first.

75.     Myra realized that she would be unable to help carry their 13-year-old autistic son, who would need help from her husband to climb to down the bed sheet rope to safety. She also realized that if she went first, her son might be more at ease about crawling out the window and climbing down the bed sheet escape rope. For these reasons, it was decided that Myra would go first.

76.     Myra crawled out of the window, grabbed the bed sheet escape rope and started to climb down. As she was climbing down, her hands slipped, and she fell onto the concrete walkway, landing on her tail bone severely injuring herself.

77.     Myra Matute is a physical therapist. She realized immediately from feeling the shooting pain in her back, which was caused by the force of the impact as she hit the concrete sidewalk, that she was seriously injured and should not move without medical assistance.

78.     After Myra Matute fell and was laying on the concrete sidewalk in pain, before anyone else attempted to climb down to safety, the families in Room 102 heard sirens from emergency vehicles approaching and decided to wait to be rescued.

-12-

79.     Shortly after Myra fell, EMS arrived on scene and transported Myra to Lancaster General Hospital for surgery on her spine. See Exhibit 7, (PA.S.P., F.M.U. Report, p. 38 of 73).

80.     The fire department brought ladders and assisted everyone else in Room 102 to climb out the windows, down the ladder and to safety. See Exhibit 7, See Exhibit 7, (PA.S.P., F.M.U. Report, p. 37 of 73).

81.     Joanne Caceres was later transported and treated for smoke inhalation. See Exhibit 7, See Exhibit 7, (PA.S.P., F.M.U. Report, p. 37 of 73).

82.     Room 103, was the fourth farthest guestroom to the west of the vending machine alcove, across the guestroom corridor on the north side. See Exhibit 1, (Floor Plan).

83.     The guests in Room 103, were Robert Decarli and his wife, Kathleen Decarli. See Exhibit 7, (PA.S.P., F.M.U. Report, p. 38 of 73).

84.     They were alerted to the fire by the fire alarm. Upon opening the door to evaluate the situation, Robert DeCarli saw flames and smoke across the hall in the vending area. He observed flames which at that moment appeared to be small. He closed the door and told his wife they needed to get out of their room. Upon reopening the door to leave he observed the fire was much larger and there was heavy smoke. See Exhibit 7, (PA.S.P., F.M.U. Report, p. 38-39 of 73).

85.     They were trapped by the fire since the two exits marked by the exit signs were both on the other side of the fire, or to the east of the fire.

86.     Knowing that he and his wife could not make it past the vending machine area because of the flames, intense heat, and heavy smoke, Robert Decarli closed the door and placed towels at the bottom of the door to keep the smoke out of their room. See Exhibit 7, (PA.S.P., F.M.U. Report, p. 38-39 of 73).

-13-

87.     He and his wife were later rescued by firefighters by using a ladder and helping them to climb out of the window in their room and down the ladder to safety. See Exhibit 7, (PA.S.P., F.M.U. Report, p. 38-39 of 73).

88.     Room 104, the fifth guestroom on the north side of the guestroom corridor, was immediately across the corridor from the vending machine alcove. See Exhibit 1, (Floor Plan).

89.     The guests in Room 104, Beth Rupert, her daughter Ariel Melaragno, and one year nine month old infant grandson Jackson Melaragno, were alerted to the fire by the fire alarm. See Exhibit 7, (PA.S.P., F.M.U. Report, p. 37 of 73).

90.     Beth Rupert and Ariel Melaragno opened the door to the hallway and saw flames directly across the corridor in the vending machine area. See Exhibit 7, (PA.S.P., F.M.U. Report, p. 37 of 73).

91.     In order to save their lives, Beth Rupert and Ariel Melaragno decided to risk leaving the room before the flames coming from the vending machine area would engulf them. In order to protect her infant son, Ariel covered him with her clothing. See Exhibit 7, (PA.S.P., F.M.U. Report, p. 37 of 73).

92.     They escaped by rushing past the flames and into the smoke and heat in the corridor, running toward the lobby exit at the eastern end of the guestroom corridor. See Exhibit 7, (PA.S.P., F.M.U. Report, p. 37 of 73).

93.     The sixth guestroom located to the west of the vending machine alcove was Room 117. See Exhibit 1, (Floor Plan).

94.     Room 117 was on the same side of the first floor guestroom corridor as the vending machine alcove and was immediately adjacent thereto, sharing a common wall. See Exhibit 1, (Floor

-14-

Plan).

95.     The guests in Room 117 were Myra Matute, her husband, Andrew Fischer, and their thirteen-year-old son, V.F.. They were staying at the Amishview Inn as a birthday present for their autistic son who had specifically asked to visit Amish Country for his birthday.

96.     What happened to Myra Matute, her husband, Andrew Fischer, and their thirteen-year-old son, V.F. is described above in detail.

97.     When Myra Matute was in the corridor, she did not see any lights. Other witnesses confirm that there were no lights on in the guestroom corridor during the fire emergency.

98.     The night auditor for the Hotel, Amber Summers, also stated that there were no lights on in the guestroom corridor during the fire. See Exhibit 7, (PA.S.P., F.M.U. Report, p. 36 of 73) ("**The hallway was completely dark and had no lights on.**") (emphasis added).

99.     Other Hotel guests also stated to the Fire Marshal that there were no lights on in the guestroom corridor during the fire. See Exhibit 7, (Pennsylvania State Police, Fire Marshal Unit Report, Printed On Jun-12-2023, pp. 37 and 38 of 73).

100.    The guests in Room 105, Joe and Sharyn Bouck, were alerted to the fire by the fire alarm. See Exhibit 7 (PA.S.P., F.M.U. Report, p. 37 of 73).

101.    They got dressed and opened the guestroom door to be shocked to "see nothing but heavy black smoke and to see the orange glow of fire just a few doors down from there." See Exhibit 9, Facebook Post of February 23, 2023 by Sharyn Bouck.

102.    Since they were on the east side of the fire, they started walking towards the lobby exit at the eastern end of the corridor. "Smoke was getting thicker and it was pitch black." See Exhibit 9.

-15-

103.    Sharyn Bouck described that the smoke was causing her throat to burn, "and I was gasping for air." See Exhibit 9.

104.    Sharyn Bouck "heard someone [in the corridor] say to their child, you learned this in school to stop and drop. [So] I got down on my hands and knees and started crawling toward the lobby. All of a sudden I smacked my head on the metal doors to the lobby. They had automatically shut because of the fire. I tried to push them open, but they didn't budge. Unsure of what to do, I started yelling for Joe **being as we couldn't see each other**. Luckily someone opened the door, I saw the light and ran out. Joe got out about the same time. See Exhibit 9. (emphasis added).

105.    The Boucks were unable to see since there was no lighting in the guestroom corridor. See Exhibit 9.

106.    The guests in Room 106, Cheryl Masie, her two daughters Madison and Emily, and her mother, Susan Conenello stated to the Fire Marshal that they were alerted to the fire by the fire alarm. See Exhibit 7, (PA.S.P., F.M.U. Report, p. 37 of 73).

107.    They opened their door to the hallway and observed thick dark smoke. They then "walked toward the lobby **through the dark hallway. They did not believe there were any lights on.**" They exited through lobby and out the front doors. See Exhibit 7, (PA.S.P., F.M.U. Report, p. 37 of 73). (Emphasis added).

108.    The guests in Room 108, Carolyn Davis and Anna Loncaric, stated to the Fire Marshal, that they were alerted to the fire by the fire alarm. See Exhibit 7, (PA.S.P., F.M.U. Report, p. 38 of 73). (Emphasis added)

109.    They then began to smell smoke and realized this was a real alarm. They opened the door and saw black smoke. They made their way to the lobby and exited the front doors. "**They did**

**not believe there were any lights on in the hallway due to how dark it was in the hallway.**" See Exhibit 7 (PA.S.P., F.M.U. Report, p. 38 of 73). (Emphasis added).

110.    Defendant had a policy that no guests with children were allowed to stay in the Hotel Annex.

111.    Defendant chose to make the Annex "adults only" as a marketing scheme designed to increase sales and profits.

112.    In order to discourage families with children from entering the Annex and possibly disturb the adult guests in the Annex, there were no EXIT signs indicating that an exit access corridor leading to an exit existed at the west end of the first floor guest room corridor to the main Hotel.

113.    The doors to the enclosed bridge leading to the Annex were not in a location which was neither apparent nor immediately visible to the occupants in the six guestrooms west of the vending machine alcove.

114.    It is believed and therefore averred that none of the guests staying in the six guestrooms to the west of the vending machine alcove on the night of the fire, including Plaintiffs, were aware that the door at the west end of the first floor guestroom corridor in the main building provided access to a safe exit in the Annex.

115.    It is believed and therefore averred that the firemen and first responders who came to rescue the guests who were trapped in their rooms to the west of the vending machine alcove were unaware that the door at the west end of the first floor guestroom corridor in the main building provided access to a safe exit in the Annex.

116.    It is believed and therefore averred that since the firemen and first responders who

-17-

came to rescue the guests who were trapped in their rooms to the west of the vending machine alcove

were unaware that the door at the west end of the first floor guestroom corridor in the main building

provided access to a safe exit in the Annex, they used ladders to help those guests escape the fire by

going out of their guestroom windows and down the ladders.

## IV

## PENNSYLVANIA FIRE SAFETY CODES, REGULATIONS, AND STATUTES APPLICABLE TO HOTELS

### IV. A.  FIRE AND PANIC ACT

117.    The Fire and Panic Act, Act of April 27, 1927, P.L. 465, as amended, 35 P.S.

§§1221-1235.1 was enacted:

> To provide for the safety of persons employed, housed, or assembled in certain
> buildings and structures by requiring certain construction and ways of egress,
> equipment, and maintenance; [...] requiring the submission of plans for examination
> and approval; providing for the promulgation of rules and regulations for the
> enforcement of this act; providing for the enforcement of this act by the Department
> of Labor and Industry, [...]."

118.    The Fire and Panic Act, Act of April 27, 1927, P.L. 465, as amended, 35 P.S.

§§1221-1235.1, (hereinafter "FPA"), applies to hotels. See FPA Section 2. Classes of Buildings:

Class One Buildings.[2] See also Uniform Construction Code, ("UCC"), International Building Code,

---

[2] Portions of the Fire and Panic Act were repealed in 1999 by the Pennsylvania
Construction Code Act, Act of Nov. 10, 1999, P.L. 491, No. 45, Cl. 35, enacting the use of a
Uniform Construction Code in Pennsylvania which implemented the use of the International
Building Code in Pennsylvania. See Act 45, Section 1101. Savings. "This act shall not repeal or
in any way affect: Sections 1, 3.3, 3.4, 3.5, 3.6(f)(1)(i), (f.1) and (g), 10.1, 13, 14 and 15 of the
act of April 27, 1927 (P.L.465, No.299), referred to as the Fire and Panic Act."

However, enforcement of the IBC was not initiated for any building for which plans were
already submitted for approval to either the local municipality or the Department of Labor and
Industry. Which version was enforced also depends upon when the local municipality decided to
opt-in for local enforcement. Leacock Township, which is located in Lancaster County, did not

("IBC"), Section 310.2 Residential Group R-1, occupancies containing sleeping units where the occupants are primarily transient in nature, including: [...] Hotels (transient), Motels (transient).

119. When the main building of the Hotel was constructed, it is believed and therefore averred that it was covered under FPA, Section 2. Classes of Buildings, Class I Buildings. See also IBC Section 310.2.

120. Under the FPA, Section 1. Definitions, it is set forth that: "Every building enumerated in this act [...] shall be so constructed [...] with respect to [...] number and type of ways of egress, aisles and passageways, stairs and fire escapes, wall openings, exits and exit signs, doors and doorways [...] emergency lighting, [...] fire alarm systems, fire drills, electrical equipment, [...] number of occupants, [...] and all other fire and panic protection as to provide for the safety and health of all persons employed, accommodated, housed, or assembled therein."

121. Under the FPA, Section 4, Ways of Egress, it is set forth that: "From every floor of buildings, enumerated in section two of this act, there shall be proper and sufficient ways of egress and means of escape from fire and panic."; see also IBC Section 1006.

122. Under the FPA, Section 4, it is set forth that: "The Department of Labor and Industry shall promulgate rules and regulations concerning the proper and sufficient ways of egress and means of escape from fire and panic from buildings enumerated in section 2."

123. One such set of rules and regulations can be found in the Pennsylvania Code, Chapter 50, which provides General Requirements - Buildings, 34 Pa. Code § 50, relating the FPA, hotels are governed as a Division C-2 building by this Chapter. See 34 Pa. Code §50.1 (c)(2); see also IBC Section 310.2.

---

Opt-In until May 17, 2004, with "No Amendments" to the Uniform Construction Code.

124.    Another set of rules and regulations can be found in the Pennsylvania Code, Chapter 55, which provides  Division C-2 Hotels, Motels, Apartment Buildings, Etc., relating to the FPA, hotels are also governed as a Division C-2 building by this Chapter. See 34 Pa. Code §55.1; see also Chapter 55, Cross References, "... 34 Pa. Code §50.1 (relating to occupancy groups) ..."; see also IBC Section 310.2.

125.    Under the FPA, Section 4, it is set forth that: "The Department of Labor and Industry may order fire walls, smoke barriers, additional fireproofing, or the enclosure of vertical openings, to be built in buildings already erected, or which may hereafter be erected, where in its judgment the erection of such fire walls, smoke barriers, additional fireproofing, or the enclosure of vertical openings is necessary to the reasonable safe protection of the occupants. The ways of egress shall be free from obstruction, lighted, and ready for instant use at all times."; see also IBC Section 1020.6 Corridor Continuity "Fire-resistance-rated corridors shall be continuous from the point of entry to an exit, and shall not be interrupted by intervening rooms. [...]."

### IV.A.1.    MEANS OF EGRESS

126.    It is believed, and therefore averred, that it is required that there shall be a minimum of two exits reasonably remote from each other. At least 50% of required exits shall be exit discharge doors, stair towers or ramps. 34 Pa. Code § 55.21(a). Minimum exits; see also IBC Section 1006.3.3, Section 1001.2 Minimum Requirements "It shall be unlawful to alter a building or structure in a manner that will reduce the number of exits or the minimum width or required capacity of the means of egress to less than required by this code."

127.    It is believed, and therefore averred, that at least "two exit routes must be available in a workplace to permit prompt evacuation of employees and other building occupants during an

emergency [...]. The exit routes must be located as far away as practical from each other so that if one exit route is blocked by fire or smoke, employees can evacuate using the second exit route. 29 CFR § 1910.36 (b)(1), Design and construction requirements for exit routes, (b) The number of exit routes must be adequate, (1) Two exit routes; see also IBC Section 1006.3.3.

128.    It is believed, and therefore averred, that at least two exits must be safely accessible from every floor of the Defendant Hotel. See IBC Section 1006.3.3.

129.    It is believed, and therefore averred, that where more than one exit is required from a building or portion thereof, such exits shall be remotely located from each other and shall be arranged and constructed to minimize the possibility that more than one exit has the potential to be blocked by any fire or other emergency condition. See IBC Section 1007, Exit and Exit Access Configuration, and subparts.

130.    It is believed, and therefore averred, that either direct access to exits or safe and continuous corridors or aisles leading directly to every exit and arranged so as to be conveniently accessible by every occupant shall be maintained and kept unobstructed on all floors of buildings. 34 Pa. Code § 50.22 (a) Exit accessibility standards; see also IBC Section 1020.6 Corridor Continuity "Fire-resistance-rated corridors shall be continuous from the point of entry to an exit, and shall not be interrupted by intervening rooms. [...]."

131.    It is believed, and therefore averred, that the Defendant Hotel is required to provide all guests with a safe pathway from their guestrooms to at least two exterior exits in the event of a fire. See IBC Section 1006.3.3.

132.    It is believed, and therefore averred, that the exits, or exit access doors, shall be located so that if one becomes blocked by fire or other emergency condition, the others shall be

available. See IBC Section 1006.

133.    It is believed, and therefore averred, that exit access shall be arranged so that it is not necessary to pass through any area which could become blocked by any one fire or other emergency condition. See IBC Section 1020.6 Corridor Continuity, "Fire-resistance-rated corridors shall be continuous from the point of entry to an exit, and shall not be interrupted by intervening rooms. [...]".

134.    It is believed, and therefore averred, that every door and every principal entrance that is required to serve as an exit shall be designed and constructed so that the path of egress travel is obvious and direct.

135.    It is believed, and therefore averred, that an exit access corridor means a corridor which is separated from all other rooms or spaces by full height partitions (floor to ceiling). 34 Pa. Code § 50.22 (c); see also IBC Section 1020.6 Corridor Continuity

136.    It is believed, and therefore averred, that exit access corridors shall lead directly to exits. 34 Pa. Code § 50.22 (c); see also IBC Section 1020.6 Corridor Continuity

137.    It is believed, and therefore averred, that exit access corridors must provide protected exit access where floor areas are separated from each other by floor to ceiling partitions. 34 Pa. Code § 50.22 (c); see also IBC Section 1020.6 Corridor Continuity Fire-resistance-rated corridors shall be continuous from the point of entry to an exit, and shall not be interrupted by intervening rooms.

138.    It is believed, and therefore averred, that unprotected openings shall be prohibited in exit access corridor walls and doors. See 34 Pa. Code § 50.22 (c); see also IBC Section 1020.6 Corridor Continuity, "Fire-resistance-rated corridors shall be continuous from the point of entry to an exit, and shall not be interrupted by intervening rooms. [...]".

-22-

### IV.A.2. EXIT SIGNS

139. In the event of a fire, the main communication between the Hotel and the guests is in the hands of the pre–placed signage in the guestroom corridors.

140. It is believed, and therefore averred, that exit access and exit doors shall be designed and arranged to be clearly recognizable. See IBC Section 1011, 1013.1, and Section 1003.2.10 which require exits and exit access doors to be marked by illuminated exit signs. In addition, the IBC requires a tactile "EXIT" sign adjacent to the door to an egress stairway, an exit passageway, and the exit discharge See IBC Sections 1011.3, and 1003.2.

141. It is believed, and therefore averred, that mirrors shall not be placed in or adjacent to any exit in such a manner as to confuse the direction of exit.

142. It is believed, and therefore averred, that all exits shall be marked by a readily visible sign. 34 Pa. Code § 50.22 (e); see also IBC Section 1011, Section 1003.2.10, and 1013.1 Where required. "Exits and exit access doors shall be marked by an approved exit sign readily visible from any direction of egress travel. [...]".

143. It is believed, and therefore averred, that all reliable fire exits must be clearly marked and visible even in the event of power loss or smoke accumulation. See OSHA emergency lighting requirements and exit sign placement are encapsulated in 29 CFR § 1910.37; see also IBC Section 1008.3.1 General, "In the event of power supply failure in rooms and spaces that require two or more means of egress, an emergency electrical system shall automatically illuminate all of the following areas: 1. Aisles. 2. Corridors. 3. Exit access stairways and ramps."

144. It is believed, and therefore averred, that every exit sign shall have ''EXIT'' printed in plainly legible letters not less than 6 inches high with the principal strokes of letters not less than

3/4 inch wide. 34 Pa. Code § 50.22 (f); see also IBC Section 1011, and Section 1003.2.10

145.    It is believed, and therefore averred, that if a doorway in a guestroom corridor does not have an "EXIT" sign, then that doorway is neither considered to be an exit, nor provides exit access.

146.    It is believed, and therefore averred, that each doorway or passage along an exit access that could be mistaken for an exit must be marked "Not an Exit" or similar designation, or be identified by a sign indicating its actual use (e.g., closet). 29 CFR § 1910.37(b)(5).

147.    It is believed, and therefore averred, that access to exits shall be marked by readily visible signs indicating the direction of travel where the exit or way to reach the exit is not immediately visible to the occupants. 34 Pa. Code § 50.22 (e); see also See IBC, Section1013, Exit Signs, 1013.1Where required.

148.    It is believed, and therefore averred, that if the direction of travel to the exit or exit discharge is not immediately apparent, signs must be posted along the exit access indicating the direction of travel to the nearest exit and exit discharge. Additionally, the line-of-sight to an exit sign must clearly be visible at all times. 29 CFR § 1910.37(b)(4); see also See IBC, Section1013, Exit Signs, 1013.1Where required. "Exits and exit access doors shall be marked by an approved exit sign readily visible from any direction of egress travel. The path of egress travel to exits and within exits shall be marked by readily visible exit signs to clearly indicate the direction of egress travel in cases where the exit or the path of egress travel is not immediately visible to the occupants. Intervening means of egress doors within exits shall be marked by exit signs. Exit sign placement shall be such that any point in an exit access corridor or exit passageway is within 100 feet (30 480 mm) or the listed viewing distance of the sign, whichever is less, from the nearest visible exit sign."

-24-

149.    It is believed, and therefore averred, that an EXIT sign with arrow can help direct traffic down a hall, around a corner, or through a door. 29 CFR § 1910.37(b)(4); see also See IBC, Section1013, Exit Signs, 1013.1Where required.

150.    It is believed, and therefore averred, that an illuminated exit sign with a directional indicator showing the direction of travel shall be placed in every location where the direction of travel to reach the nearest exit is neither apparent nor immediately visible to the occupants. 29 CFR § 1910.37(b)(4); see also IBC, Section1013, Exit Signs, 1013.1Where required.

151.    International Business Code Section 1101, and Section 1003.2.10, require illuminated exit signs at exits and exit access doors where two or means of egress are required. In addition, tactile exit signs are required at exit doors leading to enclosed exit stairways and exit doors leading to outside.

152.    It is believed, and therefore averred, that illuminated exit sign placement shall be such that no point in an exit access corridor is in excess of 100 feet from the nearest illuminated exit sign. See IBC, Section1013, Exit Signs, 1013.1Where required.

### IV.A.3.    GUESTROOM DOOR EVACUATION MAP

153.    It is believed, and therefore averred, that Defendant must post on the back of each guest room door in the Hotel an evacuation map which provides directions to the location of the two closest emergency exits to the guestroom. See IBC Section 403.10.1.1, Evacuation diagrams. "A diagram depicting two evacuation routes shall be posted on or immediately adjacent to every required egress door from each hotel or motel sleeping unit."

154.    It is believed, and therefore averred, that the map on the inside of the door of guestroom 117 of he Defendant Hotel showed that the two closest emergency exits were located to

-25-

the east, or to the right, of guestroom 117.

155.  It is believed therefore averred that if there is an alteration to the layout of a Hotel, that includes any changes to the layout of the building or firefighting equipment and systems, then the emergency evacuation diagrams must be updated.

156.  It is believed therefore averred that when the Annex to the Hotel was built in 2013, and the connecting enclosed walkway to the main Hotel building was added, this created an alteration to the layout of a Hotel, which should have required an updated evacuation map on the back of the guestroom doors to the west of the vending machine alcove in the first floor corridor of the main Hotel building.

### IV.A.4.    TRAVEL DISTANCE TO EXITS

157.  It is believed, and therefore averred, travel distances to exits shall be measured in the following manner: (1) Exits shall be so arranged that the total length of travel from any point to reach an exit will not exceed 150 feet; (2) Exits shall be so arranged that one exit is not more than 200 feet from another exit; (3) Dead ends and occupancy areas with access to a single exit shall not exceed 75 feet measured as a radius with the center of the circle being the exit. 34 Pa. Code § 50.22; and 34 Pa. Code § 55.22; see also IBC Section 1006 and 1007.

158.  It is believed, and therefore averred, that Defendant knew, or should have known, from the guestrooms west of the vending machine alcove, the Hotel guests were only provided one common path and no safe access to the two exits for which there were exit signs located east of the vending machine alcove.

159.  It is believed, and therefore averred, that Defendant knew or should have known that the common path provided to the guestrooms west of the vending machine alcove were faced with

-26-

the risk of a fire emanating from the vending machine alcove impacting that egress path and access to exits.

160. It is believed, and therefore averred, that Defendant knew or should have known that there was no safe pathway to the marked exits available to the six guestrooms to the west of the vending machine alcove.

161. It is believed, and therefore averred, that Defendant failed to provide any exits for the six guestrooms west of the vending machine alcove for which the total length of travel from any point to reach an exit did not exceed 150 feet. 34 Pa. Code § 50.22; and 34 Pa. Code § 55.22; see also IBC Section 1006 and 1007.

162. It is believed, and therefore averred, that Defendant failed to provide any exits for the six guestrooms west of the vending machine alcove for which the exits shall be so arranged that one exit is not more than 200 feet from another exit. 34 Pa. Code § 50.22; and 34 Pa. Code § 55.22; see also IBC Section 1006 and 1007.

163. It is believed, and therefore averred, that Defendant failed to provide any exits for the six guestrooms west of the vending machine alcove for which dead ends and occupancy areas with access to a single exit shall not exceed 75 feet measured as a radius with the center of the circle being the exit. 34 Pa. Code § 50.22; and 34 Pa. Code § 55.22; see also IBC Section 1006 and 1007.

### IV.A.5.     EMERGENCY LIGHTING

164. It is believed, and therefore averred, that emergency lighting is to be on at all times during an emergency, especially during a fire. See IBC Section 1008, Means of Egress Illumination.

165. It is believed, and therefore averred, that emergency lighting systems shall provide full illumination within 15 seconds after normal source power failure. 34 Pa. Code § 50.61(f); see

also IBC Section 1008 Means of Egress Illumination.

166.    It is believed, and therefore averred, that a complete test of all emergency lighting systems and inspection of all circuits for satisfactory operation shall be made at least once each week, except that when buildings or rooms are used less than once a week, tests may be made within 1 hour prior to the opening of the room or building on each day of use. A record of tests shall be maintained and shall be available for inspection. 34 Pa. Code § 50.61(l); see also 29 CFR Section 7.9. 3, OSHA sets forth that testing of emergency lighting monthly for at least 30 seconds, as well as an annual test for at least 90 minutes to verify that the lights would remain on for an extended period of time; see also IBC Section 1032.10.1, Activation test, "Emergency lighting equipment shall be tested monthly for a duration of not less than 30 seconds. The test shall be performed manually or by an automated self-testing and self-diagnostic routine. Where testing is performed by self-testing and self-diagnostics, a visual inspection of the emergency lighting equipment shall be conducted monthly to identify any equipment displaying a trouble indicator or that has become damaged or otherwise impaired."

167.    It is believed, and therefore averred, that all means of egress shall be properly illuminated, either naturally or artificially, during all periods of occupancy. 34 Pa. Code § 50.22 (d); see also IBC Section 1008 Means of Egress Illumination.

### IV.A.6.        FIRE DRILLS

168.    It is believed, and therefore averred, that employees of hotels shall be instructed and drilled in the duties they are to perform in the event of fire, panic, or other emergency.

169.    It is believed, and therefore averred that fire drills of a hotel shall be held at six month intervals and shall cover such points as the operation and maintenance of the available first aid fire

appliances, the testing of devices to alert guests, and a study of instructions for emergency duties. 34 Pa. Code § 50.57; see also IBC Section 405.

170.    It is believed, and therefore averred, that upon discovery of a fire, employees shall carry out the following duties: (1) Activate the facility fire protection signaling system, if provided (2) Notify the public fire department (3) Take other action as previously instructed. See IBC Section 403.

171.    It is believed, and therefore averred, that a floor diagram reflecting the actual floor arrangement, exit locations, and room identification shall be posted in a location and manner acceptable to the authority having jurisdiction on, or immediately adjacent to, every guest room door in hotels. See IBC Section 403.10.1.1, Evacuation diagrams. "A diagram depicting two evacuation routes shall be posted on or immediately adjacent to every required egress door from each hotel or motel sleeping unit."

172.    It is believed, and therefore averred, that fire safety information shall be provided to allow guests to make the decision to evacuate to the outside, to evacuate to an area of refuge, to remain in place, or to employ any combination of the three options.

### IV.A.7.    APPROVAL OF BUILDING PLANS BY PENNSYLVANIA DEPARTMENT OF LABOR AND INDUSTRY

173.    Under the Fire and Panic Act (FPA), Section 8. "Approval of Plans", it is set forth that: the "architectural drawings, specifications, or other data showing compliance with the provisions of this act and the rules and regulations of the said department" for "every building" have to be submitted to, examined and approved by "the Department of Labor and Industry". See also 34 Pa. Code § 49.3 (a) - Submission of plans; 34 Pa. Code § 49.5 - Certification of plans ("Every

-29-

architect or engineer who shall prepare plans and specifications for any building to which this

chapter and Chapters 50-59 apply, shall file with the Bureau of Occupational and Industrial Safety,

at the time of submission of the plans, a certificate on a form as prescribed by the Department."); see

also UCC, Plan Review and Inspection Requirements A ("Pennsylvania's Uniform Construction

Code regulations require the Department of Labor and Industry to approve the following when they

are in municipalities (political subdivisions) that have opted out of UCC enforcement

responsibilities: All commercial construction").[3]

174.    Under the Fire and Panic Act (FPA), Section 8. "Approval of Plans", it is set forth

that once said plans have been "submitted and approved", the building may then be erected. See also

e.g., UCC, Part C. the Permit Approval Process. https://www.dli.pa.gov/ucc/Pages/Plan-Review-and-

Inspection-Requirements.aspx

175.    Once the building is complete and before occupancy may be permitted, the owner or

architect is to notify the Department of Labor and Industry which will then inspect the building. "If

the Department of Labor and Industry finds, after proper investigation, that the building or structure

complies with the requirements of this act, and the rules and regulations promulgated for the

enforcement of the provisions of this act, then the said department shall issue to the owner of the

building or structure a permit authorizing the occupancy or use of the building or structure." See

---

[3] The main building of the Hotel was built in 2003. At that time Leacock Township, had not yet made a decision to Opt-in to self enforcement responsibilities under the UCC, which did not occur until May 17, 2004. See https://www.dli.pa.gov/Individuals/Labor-Management-Relations/bois/Documents/UCCMUN.HTM.

Pennsylvania's Uniform Construction Code regulations require the Department of Labor and Industry to approve the following when they are in municipalities (political subdivisions) that have opted out of UCC enforcement responsibilities: All commercial construction."). See https://www.dli.pa.gov/ucc/Pages/Plan-Review-and-Inspection-Requirements.aspx.

FPA, Section 9. "Permits for Use or Occupancy."; see also 34 Pa. Code § 49.7 - Legal effect of approval of plans; see also UCC, Part H. Application Requirements: Building, Structure, and Facility Permits, or Part K. Application Requirements: Building Permits/occupancy Certificates for "Uncertified Buildings". https://www.dli.pa.gov/ucc/Pages/Plan-Review-and-Inspection-Requirements.aspx

176.    After reasonable investigation, it is believed, and therefore alleged, that Defendant did not apply for approval of the plans for construction of the Hotel with the Department of Labor and Industry in or before 2003.

177.    After reasonable investigation, it is believed, and therefore alleged, that Defendant did not receive a Certificate of Occupancy for the Hotel from the Department of Labor and Industry in 2003 and is, or was, an "Uncertified Building". See UCC Part K. Application Requirements: Building Permits/occupancy Certificates for "Uncertified Buildings". https://www.dli.pa.gov/ucc/Pages/Plan-Review-and-Inspection-Requirements.aspx.

V.

## DAMAGES SUFFERED BY PLAINTIFFS AS A DIRECT AND APPROXIMATE RESULT OF THE ABOVE ACTIONS, AND OR INACTIONS, OF DEFENDANT AS SET SET FORTH ABOVE

### V.A.   INJURIES TO MYRA MATUTE

178.    As a direct and proximate result of the negligence of Defendant as described in this Complaint, Plaintiff has suffered severe and grievous injuries, including but not limited to injuries to her body and person. The injuries include, but are not limited to, the following, all or some of which may be permanent in nature:

-31-

a.    damaged vertebrae in the back;

b.    damaged spinal cord;

c.    Paraplegia;

d.    damage to nerves, tendons and muscles in the back;

e.    loss of bladder and bowel function;

f.    depression;

g.    difficulty in concentrating;

h.    loss of focus;

I.    loss of sleep;

j.    sleep disturbances;

k.    anxiety;

l.    fear;

m.    irritability;

n.    pain;

o.    numbness;

p.    decrease and/or loss of feeling in the lower extremities;

q.    loss of function in the legs;

r.    loss of function in the hips;

s.    loss in sexual function; and

t.    scarring and/or disfigurement from surgery.

179.    As a direct and proximate result of the negligence of Defendant as described in this

Complaint, and the events that transpired as a result thereof, Plaintiff has and may continue to suffer

-32-

the following damages:

> a. She has suffered, and will continue to suffer, severe physical pain, the inability to walk, mental anguish and anxiety, emotional distress, humiliation and loss of life's pleasures;

> b. She has, and will continue to be, obligated to undergo medical attention, surgeries, care, and expend various sums of money and to incur various expenses related to her care and treatment, training and awareness, rehabilitation and wellness, service coordination, tools for independent and integrated living, personal support/attendant services and greater accessibility;

> c. She has suffered, and may continue to suffer, an interruption of family relationships;

> d. She has, and may continue to suffer, lost income, a loss of earnings since the injury, loss of future income and loss of future earning capacity;

> e. Her general health, strength and vitality have been impaired and the impairment will be permanent; and

> f. Other costs related to care, including, but not limited to, wheelchairs, modified homes and vehicles, a vehicle with a ramp and capable of transporting a wheel chair, medication such as antibiotics or painkillers, nursing care or home aide, travel expenses back-and-forth to receive ongoing, specialized care, and the cost of having loved ones to come and care for them or their home or son;

> g. Loss of life quality. Plaintiffs will not be able to engage in the life they once enjoyed or even engage in simple, daily tasks without assistance. Everyday life is and will

be more difficult, and often more expensive;

      h.     Emotional pain and suffering. Losing something as fundamental as the ability to walk can be devastating. As a result of the sudden paraplegia caused by the traumatic accident described herein Myra Matute also suffers from depression, which may require medication and therapy to work through.

## V.B.  DAMAGES TO PLAINTIFF ANDREW FISCHER, HUSBAND

180.    Plaintiff, Andrew Fischer, is the husband of Plaintiff, Myra Matute.

181.    As Plaintiffs were attempting to evacuate the burning Hotel, Andrew Fischer was exposed to thick black smoke which was billowing from the vending machine alcove. Andrew Fischer, husband of Myra Matute, suffered injury from smoke inhalation during the fire at the Hotel.

182.    At the time of the aforesaid fall of Myra Matute, her husband, Andrew Fischer, was standing in the Hotel guestroom 102 observing his wife through the guestroom window as she descended from the second story of the Hotel using a bed sheet rope.

183.    Andrew Fischer became unnerved, and emotionally shattered, as he saw his wife lose her grip and fall and could do nothing to help her.

184.    As a result of watching the fall of his wife, Andrew Fischer, husband of Myra Matute, suffered a shock to his nerves and nervous system, and sustained grievous mental pain and suffering resulting in severe depression and an acute nervous condition.

185.    As a result of the foregoing, Andrew Fisher was required to expend money for medicines and/or tranquilizers, and may be required to expend considerable sums for the treatment of his resulting injuries and mental suffering in the future.

## V.C.   DAMAGES TO V.F., SON

186.   V.F., is the autistic son of Plaintiffs, Myra Matute and Andrew Fischer.

187.   As Plaintiffs were attempting to evacuate the burning Hotel, V.F. was exposed to thick black smoke which was billowing from the vending machine alcove. V.F., the son of Myra Matute and Andrew Fischer, suffered injury from smoke inhalation during the fire at the Hotel.

188.   At the time of the aforesaid fall of Myra Matute, her son, V.F., was standing in the Hotel guestroom 102 observing his mother through the guestroom window as she descended from the second story of the Hotel using a bed sheet rope.

189.   V.F., son of Myra Matute,  became unnerved, and emotionally shattered, as he saw his mother lose her grip and fall and could do nothing to help her.

190.   As a result of watching the fall of his mother, V.F., son of Myra Matute, suffered a shock to his nerves and nervous system, and sustained grievous mental pain and suffering resulting in severe depression and an acute nervous condition.

191.   As a result of the foregoing, Plaintiffs Myra Matute and Andrew Fischer were required to expend money for medicines and/or tranquilizers, and may be required to expend considerable sums for the treatment of his resulting injuries and mental suffering in the future.

### VI.

### FIRST CAUSE OF ACTION

### NEGLIGENCE PER SE

192.   Plaintiffs re-allege each and every allegation contained in the preceding and subsequent paragraphs, and by this reference incorporates said paragraphs as though fully set forth herein.

-35-

193.    Plaintiffs, as paying guests of the Hotel, were business invitees.

194.    As business invitees, the duty owed Plaintiffs by Defendant is the highest duty owed to any entrant upon land. Defendant is under an affirmative duty to protect a business visitor, such as Plaintiffs,  not only against known dangers but also against those which might be discovered by Defendant with reasonable care.

195.    Defendant owed Plaintiffs the duty to act as a reasonable innkeeper, obey applicable laws, codes, statutes, and ordinances, and provide its guests and/or business invitees a habitable hotel and premises safe from unreasonable danger.

196.    The following codes, regulations and statutes are all designed to protect hotel guests from injury or death caused by fires. See e.g. The Fire and Panic Act, Act of April 27, 1927, P.L. 465, as amended, 35 P.S. §§1221-1235.1,[4] FPA Section 8, FPA Section 9, 34 Pa. Code § 49.3 (a), 34 Pa. Code § 49.5, 34 Pa. Code § 49.7, 34 Pa. Code § 50.1, 34 Pa. Code § 50.1 (c)(2), 34 Pa. Code § 50.22, 34 Pa. Code § 50.22 (a), 34 Pa. Code § 50.22 (c), 34 Pa. Code § 50.22 (d), 34 Pa. Code § 50.22 (e), 34 Pa. Code § 50.22 (f), 34 Pa. Code § 50.57, 34 Pa. Code § 50.61(f), 34 Pa. Code §

---

[4] Under the FPA there is a Private right of action, set forth in Section 14. Liability of Owner. "In case of fire or panic occurring in any of the buildings enumerated in the foregoing sections of this act, in the absence of such safeguards and ways of egress which it is the intent and purpose of this act and the rules and regulations of the department to have provided, the owner or owners aforesaid shall be liable for damages in case of death or personal injury, the result of fire or panic in any of the said buildings, and such action for damages may be maintained by any person now authorized by law to sue as in other case of loss by death or injuries."

Portions of the Fire and Panic Act were repealed and others were saved in 1999 by the Pennsylvania Construction Code Act, Act of Nov. 10, 1999, P.L. 491, No. 45, Cl. 35, enacting the use of a Uniform Construction Code in Pennsylvania. See Act 45, Section 1101. Savings. "This act shall not repeal or in any way affect: Sections 1, 3.3, 3.4, 3.5, 3.6(f)(1)(i), (f.1) and (g), 10.1, 13, 14 and 15 of the act of April 27, 1927 (P.L.465, No.299), referred to as the Fire and Panic Act."

-36-

50.61(l), 34 Pa. Code § 55.1, 34 Pa. Code § 55.21(a), 34 Pa. Code § 55.22, 29 CFR § 1910.36, 29 CFR § 1910.37(b)(4), 29 CFR § 1910.37(b)(5), 29 CFR 1926.403(i)(1)(i), 29 CFR 1926.403(i)(2)(i), IBC § 403.10.1.1, IBC § 405, IBC § 1001.2, IBC § 1003.2, IBC § 1003.2.10, IBC § 1006, IBC § 1006.3.3, IBC § 1007, IBC § 1008, IBC § 1011, IBC § 1011.3, IBC § 1013.1, IBC § 1003.2.10, IBC § 1008.3.1, IBC § 1020.6, IBC § 1032.10.1, IBC § 1101, and NEC Section 110.26(A).

197.    Defendant owed to Plaintiffs, as hotel guests and business invitees, the non-delegable duty to provide a safe means of egress from all Hotel guestrooms, to maintain the Hotel and its common areas and means of egress in a reasonably safe condition, to use reasonable care when inspecting, servicing and maintaining the Hotel and its common areas and means of egress, to mark all exits with illuminated exit signs, to provide emergency lighting in the guestroom corridor on the first floor of the main building of the Hotel during the fire on February 23, 2023, and to comply with all applicable building and hotel fire codes, statutes, and regulations. See e.g. The Fire and Panic Act, Act of April 27, 1927, P.L. 465, as amended, 35 P.S. §§1221-1235.1, FPA Section 8, FPA Section 9, 34 Pa. Code § 49.3 (a), 34 Pa. Code § 49.5, 34 Pa. Code § 49.7, 34 Pa. Code § 50.1, 34 Pa. Code § 50.1 (c)(2), 34 Pa. Code § 50.22, 34 Pa. Code § 50.22 (a), 34 Pa. Code § 50.22 (c), 34 Pa. Code § 50.22 (d), 34 Pa. Code § 50.22 (e), 34 Pa. Code § 50.22 (f), 34 Pa. Code § 50.57, 34 Pa. Code § 50.61(f), 34 Pa. Code § 50.61(l), 34 Pa. Code § 55.1, 34 Pa. Code § 55.21(a), 34 Pa. Code § 55.22, 29 CFR § 1910.36, 29 CFR § 1910.37(b)(4), 29 CFR § 1910.37(b)(5), 29 CFR 1926.403(i)(1)(i), 29 CFR 1926.403(i)(2)(i), IBC § 403.10.1.1, IBC § 405, IBC § 1001.2, IBC § 1003.2, IBC § 1003.2.10, IBC § 1006, IBC § 1006.3.3, IBC § 1007, IBC § 1008, IBC § 1011, IBC § 1011.3, IBC § 1013.1, IBC § 1003.2.10, IBC § 1008.3.1, IBC § 1020.6, IBC § 1032.10.1, IBC § 1101, and NEC Section 110.26(A).

198. Upon information and belief, Defendant had actual and constructive notice of the code violations, statutory violations, and regulatory violations, as well as the dangerous conditions, and/or deficiencies that rendered the Hotel and its common area in the first floor guestroom corridor in the main building unsafe, prior to the fire described herein.

199. Upon information and belief, Defendant had actual and constructive notice that Defendant's conduct of placing vending machines, which are a known source of fire, in an alcove with direct access to the first floor guestroom corridor in the main building, and only providing exit signs to the exits located on the eastern end of the guestroom corridor created an unsafe and dangerous condition for the six rooms located to the west of the vending machine alcove.

200. Upon information and belief, Defendant had actual and constructive notice that Defendant's conduct of placing vending machines, which are a known source of fire, in an alcove with direct access to the first floor guestroom corridor in the main building, without providing a safe pathway of egress for the six guestrooms located to the west of the vending machine alcove, created a foreseeable zone of risk and danger from fire, smoke, and heat to the guests of the Hotel staying in rooms located to the west of the vending machine alcove.

201. Upon information and belief, Defendant had actual and constructive notice that there is an electrical panel in the vending machine alcove in the first floor guestroom corridor of the main Hotel building.

202. The electrical panel in the vending machine alcove in the first floor guestroom corridor of the main Hotel building had a large warning label on the panel which states:

-38-

# DANGER

AREA IN FRONT OF THIS

ELECTRICAL PANEL MUST BE

KEPT CLEAR FOR 36 INCHES.

OSHA-NEC REGULATIONS

See Exhibit 10, PA State Police Report Photos dated 2023.02.23, Photo DSC_0168 JPG.

203.    Pursuant to Electrical Panel Clearance: Requirements and Safety Regulations, an electrical panel clearance refers to the minimum distance required between an electrical panel and any surrounding objects or surfaces. This clearance is mandated by safety regulations to prevent electrical hazards such as electrocution, fire, or equipment damage. This clearance provides adequate workspace for electricians to safely access electrical panels, reducing the risk of accidental contact with live wires, and allowing for proper ventilation to prevent overheating. The importance of electrical panel clearance is fundamental, as it can mean the difference between life and death in case of an electrical mishap.

204.    The Occupational Safety and Health Administration (OSHA) is a federal agency responsible for ensuring workplace safety in the US. OSHA has established specific requirements for electrical panel clearance to prevent electrical hazards and promote worker safety, as stated in the 1926.403 standard.

205.    Minimum Workspace Requirements: OSHA requires a minimum workspace of 30 inches wide, 36 inches deep, and 78 inches high for electrical equipment such as panels. This space is necessary to provide enough room for workers to perform maintenance, testing, or repairs safely

and efficiently. See 29 CFR 1926.403(i)(1)(i) Working clearances.

206.    "[L]ive parts of electric equipment operating at 50 volts or more shall be guarded against accidental contact by cabinets or other forms of enclosures, ...:" 29 CFR 1926.403(i)(2)(i) Guarding of live parts.

207.    The National Electrical Code (NEC), developed by the National Fire Protection Association (NFPA), is a set of standards and regulations that outline the safe installation and use of electrical wiring and equipment in buildings.

208.    The NEC sets specific requirements for electrical panel clearance, including clearances above, below, in front of, and around electrical panels. These requirements are intended to provide adequate workspace for electricians to access electrical panels safely and prevent accidental contact with live wires.

209.    NEC Section 110.26(A), requires a clear space at least 30 inches wide and 36 inches deep. NEC Section 110.26(A) provides the minimum required work space depth for electrical equipment rated 0-1000 volts (to ground) that is likely to be examined or worked on while energized.

210.    Electrical panel clearance is a crucial aspect of electrical safety that must not be overlooked. Compliance with the National Electrical Code and OSHA requirements is vital to prevent electrical hazards, including electrical shock, fires, and damage to equipment.

211.    Building owners and occupants must understand the importance of electrical panel clearance to avoid liability issues. By ensuring compliance with electrical panel clearance requirements and implementing best practices, a safer electrical environment is created for everyone.

212.    Upon information and belief, Defendant had actual and constructive notice that the electrical panel in the vending machine alcove in the first floor guestroom corridor of the main Hotel

building required a minimum of 36 inches of clearance in order to safely open and service the electrical panel.

213.    Upon information and belief, Defendant had actual and constructive notice that the size of two vending machines and the ice machine when sitting next to each other in the alcove in the first floor guestroom corridor of the main Hotel building caused the vending machine closest to the electrical panel, (the refrigerated drink machine), to be significantly closer than 36 inches from the electrical panel.

214.    Upon information and belief, Defendant had actual and constructive notice that placing the (the refrigerated drink machine), significantly closer than 36 inches from the electrical panel, caused a safety hazard in that the electrical panel could not be fully opened and properly serviced and maintained.

215.    Upon information and belief, Defendant chose to place sales over safety and profits over people by placing the (the refrigerated drink machine), significantly closer than 36 inches from the electrical panel, and cause a safety hazard.

216.    It is believed, and therefore averred, that Defendant knew, or had reason to know, that Defendant's actions described above created a high degree of risk, and/or might substantially increase the risk of serious physical harm to another in a perceptible way, and deliberately proceeded to act (or failed to act) in conscious disregard of, or indifference to, that risk.

217.    Defendant breached its duties in that it was negligent in exercising ordinary care by negligently, recklessly, and carelessly creating a dangerous condition which exposed the guests in the six guestrooms west of the vending machine alcove to be directly exposed to the risk of harm by the manner in which Defendant owned, operated, managed, maintained, supervised, inspected,

and/or failed to inspect, controlled, and/or renovated the Hotel, including the property's fire prevention, suppression, and/or safety systems, emergency egress routes, lighting, exit signage, employee training, placement of vending machines, and utility services at the time Plaintiffs occupied the Hotel. Defendant's recklessness, carelessness and negligence included, but was not limited to:

a.    placing exit signs in the first floor guestroom corridor in the main building which directed the guests in the six guestrooms west of the vending machine alcove to travel into the zone of risk of danger by having to go past the vending machine alcove and into the fire in order to attempt to reach the two exits and safety on the other side, (east side), of the vending machine alcove;

b.    placing a mirror at the west end of the first floor guestroom corridor which created a likelihood of confusion and misunderstanding that the west end of the corridor was a dead-end;

c.    having a faulty emergency lighting system installed in the first floor guestroom corridor which failed to work during the fire emergency that is the subject of this lawsuit;

d.    choosing to place sales over safety and profits over people by choosing to locate the vending machines in an unprotected alcove in the middle of the first floor guestroom corridor for financial profit motives and thereby place the guests in the six guestrooms to the west of the vending machine alcove at risk of injury and death from fire, heat, and smoke caused by a fire in the vending machines, without providing safe access to an exit;

e.    choosing to place sales over safety and profits over people by choosing to not provide safe access to an exit within either 75 feet or 150 feet of the guestrooms west of the vending machine alcove, for the sake of making money from the vending machines;

f.    choosing to place sales over safety and profits over people by choosing to place evacuation maps on the back side of the door to guestroom 117 which showed that the pathway to the two exits in the event of fire were both located to the east of the vending machine alcove, which would place the guests in guestroom 117 in the risk of danger caused by a fire emanating from the vending machine alcove;

g.    choosing to place sales over safety and profits over people by choosing to not place any exit signs to the west of the six guestrooms west of the vending machine alcove,

since exits signs in this direction would lead families with children into the annex of the Hotel which marketed the annex for "adults only", and could negatively impact the profitability of the "adults only" annex by disturbing those adults with the noises and other disturbances associated with children;

h.     choosing to place sales over safety and profits over people by choosing to locate the vending machines in an area in the first floor guestroom corridor which prevented the six guestrooms to the west of the vending machine alcove from being within 75 or 150 feet of an exit;

i.     choosing to not inspect and/or maintain or adequately maintain the utilities, specifically the emergency lighting system, for the first floor guestroom corridor in the main building;

j.     choosing to not correct the lack of providing safe exits within 75 or 150 feet of the six guestrooms west of the vending machine alcove and other dangerous conditions relating to fire safety at the Hotel as described herein, when Defendant knew or should have known of their existence;

k.     choosing to not provide a safe and secure means of moving about the subject property for Plaintiffs while staying in guestroom 117, including escaping the fire, smoke, and, intense heat emanating from the vending machine alcove as required by Pennsylvania law;

l.     choosing to not comply with the applicable building, hotel and fire codes;

m.     choosing to act unreasonable under the circumstances; and

n.     in otherwise failing to use due care and caution under the circumstances.

218.     Plaintiffs are informed and believe and allege thereon that these unsafe and dangerous conditions were known to Defendant and/or were discoverable through reasonable inspection of the property.

219.     As a result of Defendant's negligence per se, the Hotel was in an unsafe and dangerous condition so that instead of protecting the Plaintiffs, Hotel guests, and business invitees, Defendant actually exposed them to an unreasonable risk of harm and made the risk worse, instead of reducing the risk of danger and injuries caused by fire, smoke, and heat emanating from the

vending machine alcove in the first floor guestroom corridor in the main hotel building.

220.   Plaintiffs are part of the class of people intended to be protected by the fire codes of the Commonwealth of Pennsylvania and other applicable codes, regulations, laws, and ordinances of which Defendant violated, including, but not limited to, the following: The Fire and Panic Act, Act of April 27, 1927, P.L. 465, as amended, 35 P.S. §§1221-1235.1, FPA Section 8, FPA Section 9, 34 Pa. Code § 49.3 (a), 34 Pa. Code § 49.5, 34 Pa. Code § 49.7, 34 Pa. Code § 50.1, 34 Pa. Code § 50.1 (c)(2), 34 Pa. Code § 50.22, 34 Pa. Code § 50.22 (a), 34 Pa. Code § 50.22 (c), 34 Pa. Code § 50.22 (d), 34 Pa. Code § 50.22 (e), 34 Pa. Code § 50.22 (f), 34 Pa. Code § 50.57, 34 Pa. Code § 50.61(f), 34 Pa. Code § 50.61(l), 34 Pa. Code § 55.1, 34 Pa. Code § 55.21(a), 34 Pa. Code § 55.22, 29 CFR § 1910.36, 29 CFR § 1910.37(b)(4), 29 CFR § 1910.37(b)(5), 29 CFR 1926.403(i)(1)(i), 29 CFR 1926.403(i)(2)(i), IBC § 403.10.1.1, IBC § 405, IBC § 1001.2, IBC § 1003.2, IBC § 1003.2.10, IBC § 1006, IBC § 1006.3.3, IBC § 1007, IBC § 1008, IBC § 1011, IBC § 1011.3, IBC § 1013.1, IBC § 1003.2.10, IBC § 1008.3.1, IBC § 1020.6, IBC § 1032.10.1, IBC § 1101, and NEC Section 110.26(A).

221.   The aforementioned, codes, regulations, and statutes apply to the conduct of Defendant in providing a safe hotel for the guest, since Defendant was responsible for the safety and welfare of the hotel guests, including Plaintiffs.

222.   Defendant, by actions and omissions as alleged herein, by violating the aforementioned codes, statute and regulations, directly and/or proximately caused the injuries and damages to Plaintiffs as set for forth in this Complaint.

223.   As a direct and/or approximate result of the Defendant's negligence, Plaintiffs have suffered injuries and/or severe emotional distress and/or property damage in excess of Seventy Five

Thousand Dollars ($75,000.00).

224.    It is believed and therefore averred that Defendant knew, or had reason to know, that

Defendant's aforementioned actions created a high degree of risk of physical harm to Plaintiffs and

other Hotel guests which might substantially increase the risk of serious harm to Plaintiffs and other

Hotel guests in a perceptible way and deliberately proceeded to act, or failed to act, in conscious

disregard of, or indifference to, that risk.

225.    As set forth above in the above paragraphs, Defendant acted with recklessness and

wanton or willful indifference to the consequences of injury to Plaintiffs, as well as an indifference

to the rights of others, including a wilful disregard for the rights and safety of the Plaintiffs.

Defendants conduct was outrageous and should be punished and made an example of by imposition

of punitive or exemplary damages in an amount in excess of Seventy-Five Thousand Dollars

($75,000.00).

## VII

## SECOND CAUSE OF ACTION

### NEGLIGENCE AND RECKLESS DISREGARD

226.    Plaintiffs re-allege each and every allegation contained in the preceding and

subsequent paragraphs, and by this reference incorporates said paragraphs as though fully set forth

herein.

227.    Plaintiffs, as paying guests staying at the Hotel, were business invitees of Defendant.

228.    As business invitees, the duty owed Plaintiffs by Defendant is the highest duty owed

to any entrant upon land. Defendant is under an affirmative duty to protect a business visitor, such

as Plaintiffs,  not only against known dangers but also against those which might be discovered by

Defendant with reasonable care.

229.    Defendant owed Plaintiffs the duty to act as a reasonable innkeeper, obey applicable laws, codes, statutes, and ordinances, and provide its guests and/or business invitees a habitable hotel and premises safe from unreasonable danger.

230.    It is believed and therefore averred, that a hotel-keeper, such as Defendant, must provide a reasonably safe structure to secure the safety of the guests in an ordinary and reasonable way without creating any dangerous conditions.

231.    Defendant owes a duty of care to the Hotel guests and Plaintiffs to:

    a.    provide a safe hotel building to the guests of the hotel who are business invitees;

    b.    provide a safe path of egress for all hotel guests in case of an emergency, such as a fire;

    c.    provide a safe path of egress from each and every hotel guestroom in case of an emergency, such as a fire;

    d.    not place vending machines in locations with open access to hotel guestroom corridors due to the potential fire hazard caused by vending machines;

    e.    provide a safe pathway to exits for the six guestrooms west of the vending machine alcove, so that Plaintiffs could use the exits to the east of the vending machine alcove in the ordinary and reasonable way without danger;

    f.    provide the six guestrooms at the west end of the first floor corridor in the main building with safe exits with illuminated signs located within 75 feet of those guestrooms; and

    g.    provide emergency lighting in the guestroom corridor located on the first floor of the main hotel building in case of an emergency, such as a fire, which was installed, properly maintained, and tested so that it would function during a n emergency.

232.    Defendant posted no warning signs to alert Hotel guests, including Plaintiffs, of the

imminent hazard Defendant created by placement of the vending machines in an alcove near the middle of the first floor guest room corridor in the main building.

233.    It is believed, and therefore averred, that Defendant negligently hired, trained, and/or supervised the managers, maintenance personnel, and employees working at the Hotel regarding fire safety, in how to properly place the vending machines in a safe location, where to place exit signs, to install, inspect, test, maintain, and/or repair the emergency lighting, and to verify that the emergency lighting system was functioning.

234.    The failure of Defendant to provide a safe pathway to exit the Hotel from Guestroom 117, was the proximate and effective cause of the injuries to Plaintiffs, since Plaintiffs were forced to exit the building through the only method they were aware of, using the windows in the guestroom across the corridor in Guestroom 102.

235.    It is believed, and therefore averred, that prior to the severe injuries suffered by Plaintiffs, Defendant had knowledge of the hazardous safety conditions described herein, and failed to remedy said conditions that were a direct and proximate result of Plaintiffs' injuries.

236.    As set forth above, Defendant owed a duty to provide and maintain a safe premises for the Hotel guests, including Plaintiffs. Defendants breached that duty causing the Plaintiffs to suffer physical injury, severe emotional distress, property damage and/or loss of property and other damages.

237.    As a direct and approximate result of the Defendants' negligence, Plaintiffs have suffered injuries and/or severe emotional distress and/or property damage and/or loss of property in excess of Seventy Five Thousand Dollars ($75,000.00).

238.    It is believed and therefore averred that Defendant knew, or had reason to know, that

-47-

Defendant's aforementioned actions created a high degree of risk of physical harm to Plaintiffs and other Hotel guests which might substantially increase the risk of serious harm to Plaintiffs and other Hotel guests in a perceptible way and deliberately proceeded to act, or failed to act, in conscious disregard of, or indifference to, that risk.

239.    That said actions of Defendant, set forth above, amount to a reckless indifference and/or a conscious disregard for the safety of the Plaintiffs, so as to constitute grossly negligent conduct, and/or willful, wanton conduct, and/or careless and/or reckless conduct.

240.    As set forth above in the above paragraphs, Defendant acted with recklessness and wanton or willful indifference to the consequences of injury to Plaintiffs, as well as an indifference to the rights of others, including a wilful disregard for the rights and safety of the Plaintiffs. Defendants conduct was outrageous and should be punished and made an example of by imposition of punitive or exemplary damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

## VIII

## THIRD CAUSE OF ACTION

## PREMISES LIABILITY

241.    That Plaintiffs repeat and re-allege each and every allegation set forth in this Complaint, as though the same were fully set forth herein.

242.    It is believed and therefore averred, that by placing vending machines in an alcove which opened directly into the guestroom corridor, immediately to the west of the exit in the middle of the corridor, Defendant had actual or constructive knowledge of a condition on the premises which created an unreasonable risk for the guests staying in the six guestrooms at the end of the

corridor and to the west of the vending machine alcove.

243.    It is believed and therefore averred, that placing the vending machines in an alcove which opened directly into the guestroom corridor, immediately to the west of the exit in the middle of the corridor, posed an unreasonable risk of harm to the guests staying in the six guestrooms at the end of the corridor and to the west of the vending machine alcove.

244.    It is believed and therefore averred, that Defendant failed to use reasonable care to reduce or eliminate the risk, by choosing to leave the vending machines in the open vending machine alcove, when they could have easily been placed elsewhere in the Hotel, in a safe location, which was not in violation of the aforementioned building codes.

245.    In addition, Defendant failed to use reasonable care to reduce or eliminate the risk, by failing to provide an open and obvious pathway to safety using illuminated signs directing the guests staying in the six guestrooms at the end of the corridor and to the west of the vending machine alcove, to travel away from the fire and towards the west end of the first floor guestroom corridor, through the unmarked doors, onto the covered walkway/bridge and using an exit located in the Annex.

246.    It is believed and therefore averred, that Defendant, through the exercise of ordinary care, knew or should have known that by choosing to place the vending machines in the open alcove and providing exit signs only to the east of the vending machine alcove, that no safe pathway to escape a fire had been provided to the guests staying in the six rooms to the west of the vending machine alcove in the first floor guestroom corridor of the main building.

247.    It is believed and therefore averred, that Defendant was negligent in exercising ordinary care by creating a dangerous condition by providing exit signs directing and showing the

guests in the six guestrooms west of the vending machine alcove that the only common pathway to escape the risk of harm caused by fire, heat, and smoke emanating from the vending machine alcove was for the guests to be directly exposed to the risk of harm by having to go into the fire, heat, and smoke emanating from the vending machine alcove in order to attempt to reach safety provided by the exits east of the vending machine alcove.

248.    It is believed and therefore averred, that the failure by Defendant to use such care proximately caused the plaintiff's injuries, which are in excess of Seventy Five Thousand Dollars ($75,000.00).

249.    That said actions of Defendant, set forth above, amount to a reckless indifference and/or a conscious disregard for the safety of the Plaintiffs, so as to constitute grossly negligent conduct, and/or willful, wanton conduct, and/or careless and/or reckless conduct.

250.    It is believed and therefore averred that Defendant knew, or had reason to know, that Defendant's aforementioned actions created a high degree of risk of physical harm to Plaintiffs and other Hotel guests which might substantially increase the risk of serious harm to Plaintiffs and other Hotel guests in a perceptible way and deliberately proceeded to act, or failed to act, in conscious disregard of, or indifference to, that risk.

251.    As set forth above in the above paragraphs, Defendant acted with recklessness and wanton or willful indifference to the consequences of injury to Plaintiffs, as well as an indifference to the rights of others, including a wilful disregard for the rights and safety of the Plaintiffs. Defendants conduct was outrageous and should be punished and made an example of by imposition of punitive or exemplary damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

## IX

### FOURTH CAUSE OF ACTION

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

252.    That Plaintiffs repeat and re-allege each and every allegation set forth in this Complaint, as though the same were fully set forth herein.

253.    The Defendants negligently caused the lack of any safe form of egress from Guestroom 117 for Plaintiffs during the fire on February 23, 2023 thereby causing injuries to Plaintiffs.

254.    The Defendants negligently caused the lack of any emergency lighting in the first floor guestroom corridor which contributed to the lack of any safe form of egress from Guestroom 117 for Plaintiffs during the fire on February 23, 2023 thereby causing injuries to Plaintiffs.

255.    As a result of experiencing their injuries and the fire, Plaintiffs suffered severe emotional distress.

256.    As a direct and proximate result of the acts, omissions, and conduct of Defendant, Plaintiffs have suffered severe emotional distress.

257.    That said failures of Defendant amounts to a conscious disregard for the safety of the Plaintiffs, as to constitute wilful, wanton acts, and/or reckless or careless acts.

258.    As a direct and approximate result of the Defendants' negligence, Plaintiffs have suffered injuries and/or severe emotional distress and/or property damage and/or loss of property in excess of Seventy Five Thousand Dollars ($75,000.00).

259.    It is believed, and therefore averred, that Defendant knew, or had reason to know, that Defendant's actions described above created a high degree of risk, and/or might substantially

increase the risk of serious physical harm to another in a perceptible way, and deliberately proceeded to act (or failed to act) in conscious disregard of, or indifference to, that risk.

260.    As set forth above in the above paragraphs, Defendant acted with recklessness and wanton or willful indifference to the consequences of injury to Plaintiffs, as well as an indifference to the rights of others, including a wilful disregard for the rights and safety of the Plaintiffs. Defendants conduct was outrageous and should be punished and made an example of by imposition of punitive or exemplary damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

## X

## FIFTH CAUSE OF ACTION

## PLAINTIFF ANDREW FISCHER LOSS OF CONSORTIUM

261.    That Plaintiffs repeat and re-allege each and every allegation set forth in this Complaint, as though the same were fully set forth herein.

262.    That as a direct and proximate result of the aforesaid negligence of Defendant, Plaintiff Andrew Fischer, as the lawful husband of Plaintiff Myra Matute, was and is entitled to the society, comfort, affection, services, companionship, and consortium of her husband.

263.    That, as a direct and proximate result of the aforesaid negligence of Defendant, Plaintiff Andrew Fischer, as the lawful husband of Plaintiff, Myra Matute, has been denied the society, comfort, affection, services, companionship, and consortium of his wife.

264.    As a direct and approximate result of the Defendants' negligence, Plaintiffs have suffered injuries and/or severe emotional distress and/or property damage and/or loss of property in excess of Seventy Five Thousand Dollars ($75,000.00).

265.    It is believed and therefore averred that Defendant knew, or had reason to know, that Defendant's aforementioned actions created a high degree of risk of physical harm to Plaintiffs and other Hotel guests which might substantially increase the risk of serious harm to Plaintiffs and other Hotel guests in a perceptible way and deliberately proceeded to act, or failed to act, in conscious disregard of, or indifference to, that risk.

266.    As set forth above in the above paragraphs, Defendant acted with recklessness and wanton or willful indifference to the consequences of injury to Plaintiffs, as well as an indifference to the rights of others, including a wilful disregard for the rights and safety of the Plaintiffs. Defendants conduct was outrageous and should be punished and made an example of by imposition of punitive or exemplary damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

## XI

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against Defendant, as follows:

1.    General damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00);

2.    Compensatory damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00);

3.    Special damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00);

4.    Medical and/or incidental expenses incurred and to be incurred in excess of Seventy-Five Thousand Dollars ($75,000.00);

5.    As set forth above in the above paragraphs, Defendant acted with recklessness and wanton or willful indifference to the consequences of injury to Plaintiffs, as well as an indifference to the rights of others, including a wilful disregard for the rights and

safety of the Plaintiffs. Defendants conduct was outrageous and should be punished and made an example of by imposition of punitive or exemplary damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00);

6.  Damages for past and future pain, suffering, mental anguish, and loss of enjoyment of life in excess of Seventy-Five Thousand Dollars ($75,000.00);

7.  Damages for past and future wage loss in excess of Seventy-Five Thousand Dollars ($75,000.00);

8.  Damages for loss of earning capacity in excess of Seventy-Five Thousand Dollars ($75,000.00);

9.  Damages for pre- and post-judgment interest as provided by law;

10.  Costs of suit, interest incurred herein, delay damages of interest; and

11.  For such other and further relief as is just and proper.

DATED this 6th day of March, 2024.

> BEHREND LAW GROUP, LLC
> /s/Kenneth R. Behrend
> Kenneth R. Behrend
> PA I.D. # 37961
> Behrend Law Group, LLC
> Fort Pitt Commons Building, Suite 220
> 445 Fort Pitt Boulevard
> Pittsburgh, PA 15219
> (412) 391-4460